(C. D. 1707)

J. J. BOLL
METRO MEDICAL DIST., INC. } *v.* UNITED STATES

United States Customs Court, Second Division

(Decided June 9, 1955)

*Sharretts, Paley & Carter* (*Howard C. Carter* and *Edward P. Sharretts, Jr.*, of counsel) for the plaintiffs.
*Warren E. Burger*, Assistant Attorney General (*Richard H. Welsh* and *Richard M. Kozinn*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: The imported articles in controversy are described in the record as "Incandescent electric light bulbs with metal filaments, No. 4" and are used in connection with Guedel laryngoscopes. They were classified by the collector of customs as parts of surgical instruments, and duty was imposed thereon at the rate of 45 per centum ad valorem in accordance with the terms of paragraph 359 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 359), as modified by the Annecy Protocol to the General Agreement on Tariffs and Trade (84 Treas. Dec. 403, T. D. 52373, and 85 Treas. Dec. 116, T. D. 52462).

Plaintiffs claim that the merchandise above referred to should have been classified as incandescent electric-light bulbs or lamps, with metal filaments, and subjected to duty at the rate of 20 per centum ad valorem pursuant to the provisions of paragraph 229 of said act (19 U. S. C. § 1001, par. 229).

The pertinent text of the competing provisions is here set forth—

Paragraph 359 of the Tariff Act of 1930, as modified, *supra*:

Surgical instruments, and parts thereof, including hypodermic syringes and forceps, composed wholly or in part of iron, steel, copper, brass, nickel, aluminum, or other metal, finished or unfinished (except hypodermic and other surgical needles, and except instruments and parts in chief value of glass) _____ 45% ad val.

Paragraph 229 of said tariff act:

PAR. 229. Incandescent electric-light bulbs and lamps, without filaments, 20 per centum ad valorem; with metal filaments, 20 per centum ad valorem; with filaments of carbon or other non-metallic material, 30 per centum ad valorem.

The following questions are presented for our determination:

(1) Are laryngoscopes in which the imported bulbs are used surgical instruments?

(2) If the first question is answered in the affirmative, are said electric-light bulbs parts of the instruments with which they are used?

At the trial, plaintiffs introduced the testimony of one witness, Reinhard Meister, who described himself as a half-owner and president of Metro Medical Distributors, Inc. (the real party in interest herein), which was established in 1948, and is engaged in buying, importing, and distributing catheters and other hospital and doctors' supplies. He testified that in 1936 he became a registered nurse and that he was supervisor of 63 orderlies and nurses at New York Hospital, his experience with surgical cases totaling 5 years in all.

Meister produced a sample of the No. 4 lamp in controversy which was received in evidence as exhibit 1. He stated that it has a metal filament and that except for the base of the exhibit it was the same type as is used in flashlights; that he has been familiar with articles like exhibit 1 since 1929 in hospitals and has seen them manufactured. He identified exhibit 1 stating that it is used in a laryngoscope and that illustrative exhibit 2 contains a picture depicting the use of exhibit 1 in a laryngoscope; that the instrument marked "Guedel large" on exhibit 2 uses the No. 4 bulb; that the other items shown on exhibit 2 employ a similar bulb to the No. 4 but of a different size, such as the "M" lamp, a sample of which was received in evidence as illustrative exhibit 3; and that the item marked "Child" on exhibit 2 uses a "1–A" bulb. A sample of this type was received in evidence as illustrative exhibit 4.

Meister explained that exhibit 1 is attached to a laryngoscope, which latter is used to introduce through the mouth and vocal cords a rubber tubing by means of which gases are supplied to the bronchia in the administration of anesthetics; that the bulbs give light to the physician or registered nurse to permit him to maneuver through the vocal cords without injuring them; that they are not used for exploratory purposes and seldom used by surgeons; that they are used by

an anesthetist or registered nurse and that there are other methods for throwing light in the same locality of the body, two methods being by means of a head mirror or flashlight; that a surgeon could use exhibit 1 for examination but not for an operation.

On cross-examination, Meister testified that a surgeon is a physician who specializes in operations and that the laryngoscope is used by the anesthetist in preparation for operational procedure; that any instrument used by a surgeon is a surgical instrument; that a surgeon never uses a laryngoscope because he needs to keep his hands free; that an anesthetic is administered by a nurse or anesthetist but under the supervision of a doctor; that exhibit 1 can be used in dental or surgical instruments; and that a laryngoscope without a bulb is of no use except as a tongue depressor.

The defendant produced two witnesses, the first of whom was Dr. Sylvester Daly, a graduate of Columbia College in 1924 and of the College of Physicians and Surgeons in 1928, who had served an internship in Fifth Avenue Hospital, New York City, for 15 months, and following that was a resident physician treating diseases of the ear, nose, and throat at the Medical Center for 2 years. He later became a staff physician at the Presbyterian Hospital and "eventually became a diplomate of the American Board—that is, a specialist." In 1933, he published a paper on nonmalignant growths of the larynx in collaboration with another physician, Dr. Brighton, and, in 1938, published a paper on secretions of the nose having to do with the protective enzymes of the nasal mucus. He stated further that "We also published an experimental paper dealing with tuberculosis in 1939." In 1940, Dr. Daly began 5½ years' service as a United States naval officer performing the general duties of a medical officer dealing with his own specialty, namely, otolaryngology. He resumed practice as a duly licensed physician in the State of New York in 1946, treating diseases of the ear, nose, and throat.

With regard to the uses of laryngoscopes, Dr. Daly, who qualified as a surgeon in the field of ear, nose, and throat diseases, testified that he had used laryngoscopes on many occasions; that it was a multiple-purpose instrument designed for use with a light because otherwise it would be impossible to see objects to be treated—for instance, in removing tumors from the larynx—and that these bulbs are useful in both exploratory and surgical operations. He stated that exhibit 1 is a bulb for a laryngoscope used largely in anesthesia and that it could also be used in an otoscope or a proctoscope. All of these instruments he regarded as surgical instruments.

In explaining how a laryngoscope is used, Dr. Daly gave the following testimony:

A. Usually it is a hospital procedure. Usually, a patient is recumbent on a table. His head is held by an assistant, and the instrument is introduced at the

back of the tongue, inserted into the tongue and the tongue is lifted up and the instrument is so designed that it fits in the back of the tongue and the bulb, when illuminated, permits a view of the larynx.

Q. Does a doctor actually hold a laryngoscope in his hand at the time he performs these various surgical feats that you mentioned before?—A. Yes, he does.

Dr. Daly further testified that a bronchoscope may be introduced through a laryngoscope to enable a surgeon to see in dark cavities; that a bronchoscope or forceps can be inserted through a laryngoscope to permit the surgeon to operate for the removal of tumors. He testified to his familiarity with the Guedel laryngoscope which is used largely in the administration of tracheal anesthetics which he regarded as a surgical manuever or operation. In Presbyterian Hospital, where Dr. Daly is presently associated, the anesthetist is classified as part of the surgical division of the hospital, his reports being filed with the surgical records. He expressed the opinion that the laryngoscope without a bulb would be useless.

The second witness called by the defendant was John F. Lipari, who had been employed for 11½ years last past in the sales department of the American Cystoscope Makers, Inc., covering sales of surgical instruments principally to the Armed Forces. His company manufactures and distributes electrically lighted instruments, refractoscopes, proctoscopes, and other allied surgical instruments. From 1933 until 1942, Lipari was associated with the firm of Werner Surgical Supplies in New York City, which company acted as manufacturers' agent in the sale of surgical instruments and other medical supplies. Prior to 1933, Lipari was associated with N. S. Low & Co., Inc., of New York City, likewise a distributor of surgical instruments and supplies.

Lipari testified from his experience with manufacturers and distributors of surgical instruments and medical supplies that he had become familiar with the use of laryngoscopes and other surgical instruments; that exhibit 1 was readily recognized as a special miniature lamp for a surgical instrument for use in laryngoscopes, otoscopes, and proctoscopes; and that exhibit 1 is an essential part of those instruments.

In their brief, plaintiffs state with reference to exhibit 1 that "These lamps are in all respects the same as the lamps used in some types of small flashlights * * *" and that "it is an incandescent lamp the same as a flash light lamp except in the construction of the base." However, there is no proof in the record that it could be used as a flashlight lamp, except when attached to the base of a laryngoscope, otoscope, or similar instrument.

Plaintiffs in their brief make the following statement:

It is a well known fact of which the Court may take judicial notice that there are several distinct phases through which the patient must progress in the course

of an illness requiring a surgical operation. These phases may be called pre-operative, operative, and post-operative. The pre-operative phase generally consists of medical examination, diagnosis and preparation for the second phase, the surgical operation. The third phase would generally have to do with medication, medical examination, and convalescence.

It is urged that a laryngoscope is not an instrument used in the second of these phases, namely, the surgical operation. We believe this contention is without merit for reasons which will appear *infra*.

Plaintiffs invite our attention to the case of *Burke* v. *Kansas State Osteopathic Association, Inc., et al.*, 111 Fed. (2d) 250, 253. In that case, reference is made to *State* v. *Johnson*, 1911, 84 Kan. 411, 114 P. 390, which distinguishes between osteopathy, medicine, and surgery. The definition of "surgery," therein contained, taken from Webster's New International Dictionary, reads as follows:

Art or practice of healing by manual operation; that branch of medical science which treats of mechanical or operative measures for healing diseases, deformities, or injuries.

Reference is also made to *Harris* v. *Fall*, 177 Fed. 79, 84, from which the following quotation is taken:

* * * the operation—which, as defined in Akridge *v.* Noble, 114 Ga. 949, 41 S. E. 78, "begins when the opening is made into the body and ends when this opening has been closed in a proper way after all appliances necessary to the successful operation have been removed from the body" * * *.

It is stated that the same definition appears in *Funk* v. *Bonham*, 151 N. E. 22, 23.

It is further contended by plaintiffs that the administration of anesthetics for which the Guedel laryngoscope is largely used is not surgery, reference being made to the case of *Napier* v. *Greenzweig*, 256 Fed. 196, 197. In that case, the court quoted the following from the definition of the word "surgery" in The Century Dictionary:

* * * therapy of a distinctly operative kind, such as cutting-operations, the reduction and putting up of fractures and dislocations, and similar manual forms of treatment. * * *

Plaintiffs quote the following from *Beile* v. *Travelers' Protective Ass'n of America*, 135 S. W. 497, 498:

Where, in an action on an accident benefit certificate stipulating that insurer should not be liable for death resulting from surgical treatment, the evidence showed that insured died while chloroform was being administered preparatory to an operation, and an attending physician testified that the proximate cause of death was acute dilatation of the heart immediately caused by the chloroform, and that insured's diseased condition did not contribute to his death, the jury could find that surgical treatment did not include the administering of chloroform; "surgery" being defined as the branch of the healing art that relates to external injuries, deformities, and other morbid conditions to be remedied directly by manual operations, "surgical" being defined as being of or pertaining to surgery, "treatment" meaning the act or manner of treating, "remedy" being

defined as something used for the cure or relief of bodily disease, and "surgical treatment" meaning treating a disease by means of surgery.

From the foregoing, plaintiffs contend that the administration of anesthesia is not judicially considered to be in the nature of surgery, pointing out that "a surgeon is a medical specialist but his training qualifies him to perform many acts in the medical profession other than surgery and the instruments he uses in these other capacities do not become surgical instruments because a surgeon uses them. An instrument does not derive its nomenclature from the person using it but from the function it performs."

Reference is also made to *Jensen Salsbery Lab., Inc.* v. *United States*, 66 Treas. Dec. 363, T. D. 47313, in support of the proposition that the test for determining if an article is a surgical instrument "seems to be whether the article forms part of the necessary equipment of a surgeon to enable him to efficiently practice his profession of surgery." Applying this test, plaintiffs conclude that a laryngoscope is neither a surgical instrument nor a part thereof "but is an instrument or part that is necessary to perform the act of giving certain types of anesthesia."

Based upon the foregoing authorities, plaintiffs insist that laryngoscopes are not surgical instruments "because they are chiefly, if not exclusively, used prior to the surgical operation."

Defendant cites the following cyclopedic and other authorities in support of its contention that a laryngoscope is a surgical instrument:

The Encyclopedia Americana, volume 16, page 755, under the heading "Laryngoscope":

* * * This type is provided with a small electric light for direct examination. By the use of the laryngoscope, the mechanism of the voice may be studied and disease of the larynx, especially that involving the vocal cords, may be detected By such examination incipient malignant disease or tuberculosis of the larynx or the vocal cords is commonly diagnosed. Its use also permits local medicinal applications to be made and certain operations to be performed.

HAROLD W. JONES, M. D.

The textbook, entitled "Diseases of the Nose and Throat," by Imperatori and Burman, second edition, page 579, wherein various uses of a laryngoscope are given in connection with the subject of "Direct Laryngoscopy":

The removal of foreign bodies, benign growths, or cicatricial stenosis;
For biopsy;
Removal of supraglottic growths;
Amputation of the epiglottis;
Endoscopic evisceration before laryngostomy is done;
Ventriculocordectomy;
Galvanopuncture or electrocoagulation in tuberculosis conditions;

Radiation applications;

Dilatation in laryngeal stenosis;

Examination of the larynx of infants and small children.

*V. Mueller & Co.* v. *United States*, 48 Treas. Dec. 651, Abstract 49975 (1925), wherein electric lamps were held to be properly classified as parts of surgical instruments in paragraph 359 of the Tariff Act of 1922. The following is quoted from the report:

> It was conceded that the chief, if not exclusive, use of these lamps is as parts of surgical instruments. It being settled customs law that a specific provision takes precedence over eo nomine designations, the lamps in question were held properly classified as parts of surgical instruments under paragraph 359. United States *v.* Boker (6 Ct. Cust. Appls. 243; T. D. 35472).

*A. S. Aloe Co.* v. *United States*, 59 Treas. Dec. 1462, Abstract 14572 (1930), wherein stethoscopes were held to be surgical instruments. The following is quoted from the reported opinion:

> * * * There was testimony that it [stethoscope] is a diagnostic instrument used to listen to the beat of the heart and serviceable for no other purpose. The court said it may well be that it is so used by every surgeon in preparing his patient for an operation but there was no competent testimony that such an article would not be included within the general class of articles commercially known as surgical instruments. * * *

*United States* v. *Kny-Scheerer Corporation of America*, 14 Ct. Cust. Appls. 446, T. D. 42080, wherein certain surgical forceps, clamps, and needle holders had been classified by the collector of customs as "hand forceps." In its opinion, the court stated in part—

> * * * The imported articles are surgical instruments and known in the trade as such; that they are classified therein, respectively, as surgical forceps, surgical clamps, and surgical needle holders; * * * that they are used exclusively in the science of surgery; that they were never known by the term "hand forceps," although they are used and operated by hand; and that they comprise a considerable proportion, approximately 45 per centum, of all surgical instruments, both as to value and kind.

The judgment of the trial court, which held that the articles were properly classifiable as surgical instruments, was affirmed.

*Jensen Salsbery Lab., Inc.* v. *United States*, 66 Treas. Dec. 363, T. D. 47313, which is likewise cited by plaintiffs in their brief, involved so-called "ear-taggers" or "applicators," consisting of plier-shaped metal instruments chiefly used by veterinary surgeons to pierce the ears of cattle in applying thereto metal identification tags. The court held said articles to be surgical instruments. Defendant directs attention to the observation of the court in that case that in determining whether a given article is a surgical instrument—"We think the real test is whether the instrument forms part of the necessary equipment of a surgeon to enable him efficiently to practice his profession of surgery."

*Carl Zeiss, Inc.* v. *United States*, 72 Treas. Dec. 538, T. D. 49237, wherein certain gastroscopes were properly classifiable as surgical instruments. In describing the use of a gastroscope, the court, in the course of its opinion, said—

Apart from the uncontradicted testimony of the only surgeon who testified in the case that the insertion of the gastroscope into the throat and stomach of the patient is in itself a surgical operation, the decisions of this court and of the appellate court do not sustain the plaintiff's contention.

It would seem from the record before us that the plaintiffs would have the provision for "Surgical instruments" given a limited and restricted meaning, whereas the defendant ascribes a broader significance to those words.

Paragraph 359 of the Tariff Act of 1930 reads as follows:

PAR. 359. Surgical instruments, and parts thereof, including hypodermic needles, hypodermic syringes, and forceps, composed wholly or in part of iron, steel, copper, brass, nickel, aluminum, or other metal, finished or unfinished, 55 per centum ad valorem, unless in chief value of glass, in which case the rate shall be 70 per centum ad valorem; dental instruments, and parts thereof, including hypodermic needles, hypodermic syringes, and forceps, wholly or in part of iron, steel, copper, brass, nickel, aluminum, or other metal, finished or unfinished, 35 per centum ad valorem, unless in chief value of glass, in which case the rate shall be 60 per centum ad valorem: * * * .

From the language above set forth, it appears that Congress by including "hypodermic needles, hypodermic syringes, and forceps" intended that the provision for "Surgical instruments" was to be given a liberal rather than a narrow interpretation. As corroborative of this conclusion, it is interesting to note the following language contained in the Summary of Tariff Information, 1929, with regard to the "Description and uses" of surgical instruments—

Surgical instruments, especially steel instruments, in size and pattern have to meet the individual requirements of surgeons, and consequently the variety within each of the different descriptions—forceps, scissors, needles, etc.—is exceedingly great. The surgical instrument catalogues for the leading kinds of instruments contain thousands of items. From the point of view of the trade, the most important groups of steel surgical instruments are forceps used for holding blood vessels, surgical scissors, towel clamps, and needle holders. * * *

Moreover, the following definition of the word "surgery" from Webster's New International Dictionary (1948) is worthy of note—

**Surgery,** *n.* * * * 1. That branch of medical science, art, and practice, which is concerned with the correction of deformities and defects, the repair of injuries, *the diagnosis and cure of diseases,* the relief of suffering, and the prolongation of life, by manual and instrumental operations. [Italics supplied.]

After a consideration of the various cases cited by the parties, some of which have been referred to, *supra,* and are predicated upon different factual backgrounds, we think the weight of authority, aided

by lexicographic references, compels the conclusion that a laryngoscope is a surgical instrument.

We shall now proceed to the second question presented for our determination in the controversy before us, namely, are the electric-light bulbs in issue parts of the instruments with which they are to be used.

As to what constitutes a "part" of an article in the tariff sense, reference is made to the well-known and oft-cited case of *United States* v. *Willoughby Camera Stores, Inc.*, 21 C. C. P. A. (Customs) 322, T. D. 46851, wherein it was stated that—

It is a well-established rule that a "part" of an article is something necessary to the completion of that article. It is an integral, constituent, or component part, without which the article to which it is to be joined, could not *function as such article. Welte & Sons* v. *United States*, 5 Ct. Cust. Appls. 164, T. D. 34249; *United States* v. *American Steel & Copper Plate Co.*, 14 Ct. Cust. Appls. 139, T. D. 41673; *Peter J. Schweitzer, Inc.* v. *United States*, 16 Ct. Cust. Appls. 285, T. D. 42872, and cases cited therein; *United States* v. *John Wanamaker*, 16 Ct. Cust. Appls. 548, T. D. 43266. [Italics quoted.]

From the testimony of the witnesses in this case, it appears that the imported articles described as "Incandescent electric light bulbs with metal filaments, No. 4" are used in a particular type of laryngoscope denominated as "Guedel large"; that a laryngoscope without a bulb is of no use except as a tongue depressor; and that the instrument was designed for use with a light because without such illumination it would be impossible to see the objects to be treated.

We are of the opinion that the weight of evidence clearly supports the conclusion that the imported incandescent electric-light bulbs, with metal filaments, are integral, constituent, and component parts, without which the laryngoscopes to which they are to be joined could not function as such articles.

From the foregoing considerations, we arrive at the conclusion (1) that laryngoscopes in which the imported electric-light bulbs are used are surgical instruments, and (2) that said bulbs are parts of laryngoscopes in the tariff sense. Granted that incandescent electric-light bulbs and lamps are specifically enumerated in paragraph 229 of the Tariff Act of 1930, the classification of the controverted articles as parts of surgical instruments within the purview of paragraph 359 of said act, as modified, *supra*, by the collector of customs was correct, inasmuch as the enumeration of "Surgical instruments, and parts thereof," being a use provision, prevails over the *eo nomine* designation of "Incandescent electric-light bulbs." *United States* v. *Snow's United States Sample Express Co.*, 8 Ct. Cust. Appls. 351, T. D. 37611.

The presumed correctness of the collector's decision has not been overcome by the plaintiffs and we therefore overrule the protest.

Judgment will be entered accordingly.