(C.D. 2402)

The O. E. M. Corp. *v.* United States

United States Customs Court, Second Division

(Decided June 12, 1963)

*John D. Rode* for the plaintiff.
*John W. Douglas*, Assistant Attorney General (*Richard E. FitzGibbon* and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: Protests 60/25749 and 60/28685, filed by plaintiff herein, were consolidated for the purpose of trial and disposition.

The importations in controversy are described on the consular invoices as " 'E.M.O.' Inhalers" and "Oxford Inflating Bellows," with other words of description, in combination also known as "E.M.O. Anaesthetic Outfit." The articles were classified by the collector of customs as surgical instruments, composed wholly or in part of metal, in paragraph 359 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 359), as modified by the Annecy Protocol to the General Agreement on Tariffs and Trade, 84 Treas. Dec. 403, T.D. 52373, supplemented by Presidential proclamation, 85 Treas. Dec. 116, T.D. 52462, and duty was imposed thereon at the rate of 45 per centum ad valorem.

It is claimed by plaintiff that the merchandise consists of certain portable anesthetic apparatus which should be classified as machines, not specially provided for, in paragraph 372 of said act (19 U.S.C. § 1001, par. 372), as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, and dutiable at the rate of 13 per centum or 12 per centum ad valorem, depending upon the date of entry (on or before or after June 30, 1957) ; or, alternatively, that the merchandise should be classified as articles, wholly or in chief value of metal, not specially provided for, in paragraph 397 of said act (19 U.S.C. § 1001, par. 397), as modified by the sixth protocol, *supra*, and dutiable at the rate of 21 per centum or 20 per centum ad valorem, according to the date of entry.

It was agreed between adversary parties that the apparatus in question is in chief value of iron, steel, brass, bronze, zinc, or aluminum. As stated by plaintiff at the opening of the trial—

There are, therefore, two, really two issues in the case. One, is the apparatus a surgical instrument? Two, if not, is it a machine or a manufacture of metal?

The pertinent text of the statutes involved is here set forth.

Paragraph 359 of the Tariff Act of 1930, as modified by the Annecy protocol, *supra:*

Surgical instruments, and parts thereof, * * * composed wholly or in part of iron, steel, copper, brass, nickel, aluminum, or other metal, * * *__ 45% ad val.

Paragraph 372 of said act, as modified by the sixth protocol, *supra:*

Machines, finished or unfinished, not specially provided for:
    Adding machines

  \*      \*      \*      \*      \*      \*      \*

    Other * * *_____ 13% ad val.
                                       12% ad val.

Paragraph 397 of said act, as modified by the sixth protocol, *supra:*

Articles or wares not specially provided for, whether partly or wholly manufactured:

  \*      \*      \*      \*      \*      \*      \*

    Composed wholly or in chief value of iron, steel, copper, brass, nickel, pewter, zinc, aluminum, or other base metal (except lead), but not plated with platinum, gold, or silver, or colored with gold lacquer:
        Typewriter spools * * *
        Not wholly or in chief value of tin or tin plate:
            Carriages, drays, * * *

\*      \*      \*      \*      \*      \*      \*

        Other, composed wholly or in chief value of iron, steel, brass, bronze, zinc, or aluminum * * *_____ 21% ad val.
                                     20% ad val.

The only witness in the case, William H. Smith, was called on behalf of the plaintiff.

Smith testified that, for the past 12 years, he had been chief engineer and chief of quality control of The O.E.M. Corp., plaintiff herein, which is engaged in the manufacture of inhalation therapy equipment, including oxygen tents, infant incubators, oxygen masks, hypothermia equipment, and cooling equipment. O.E.M. was described as a division of Shampaine Industry, which manufactures operating tables, sterilizers, operating room lights, beds, mattresses, glassware, and laboratory furniture.

Smith stated that he had been familiar with the merchandise in controversy since 1957 and produced two photographs illustrating the apparatus, which were received in evidence as plaintiff's exhibits 1 and 2. It was explained that the case or trunk in the lower part of the photograph, exhibit 1, was not included in the importation.

Exhibit 2 also illustrated the importation, with the exception of the tray upon which the item was mounted.

At the bottom of plaintiff's exhibit 1, appears the following legend:

The "E.M.O." Anaesthetic Outfit

This Outfit was developed for the United Kingdom War Department and consists of the "E.M.O." and "O.I.B." in one double transit case complete with tray and stand; the whole forming a portable anaesthetic table. Accommodation has also been made for a variety of anaesthetic accessories.

In explaining how he became familiar with the character, nature, and functional properties of the subject merchandise, Smith testified that, during World War II, he was an operating room technician in the Marine Corps; that, since the war, he had been employed as a design engineer by Columbia University and by the O.E.M. company in the designing of medical devices and demonstrating their uses.

The record further discloses that, from 1948 to 1951, Smith had been employed at Presbyterian Hospital as supervising oxygen technician; that, prior to 1948, he had been engaged as an assembler and tester of X-ray diathermy equipment with the Peerless X-Ray Corp. of New York; and, prior to 1946, he was "company aide man in the Marine Corps" of the Navy Hospital Corps, attached to the Marine Corps. Smith had lectured on oxygen therapy techniques, usually to doctors and nurses; is "a member of the A.A.I.T., which is an inhalation therapy," and the American Society of Heating, Ventilating, and Refrigerating Engineers. The witness Smith was well informed regarding the operation, character, and functions of the apparatus in controversy.

With the use of the exhibits, Smith stated that a mask, which is marked with the letter "A" on exhibit 1, is provided for the patient, the mask being connected to the bellows, marked "C," by means of corrugated tubing, marked "B."

The assembly above described is connected by means of corrugated tubing to the E.M.O. vaporizing unit inhaler, marked "E." The lower portion of this unit is shaped like a pot or tank, marked "D." To quote the witness—

* * * The E.M.O. is a vaporizing unit, which is calibrated in volumes per cent of ether. This unit is used to vaporize ether with a temperature compensating unit. The temperature compensator is used to control the vaporizer of ether at various ambient temperatures. This unit also divides the inspired air stream through the use of this volume control which appears on the top, and this is how we control the rate of ether vaporization.

Smith explained that the portions of the apparatus marked "C" and "E," respectively, may be used together or separately; that while they may be utilized during surgery "it is not part of the surgical

technique; it is part of the anesthetic technique. Surgery can be performed without anesthesia." When asked if he had ever seen a surgeon operate the anesthetic apparatus, the witness replied—

No, because in the surgical team of the Navy that I was a part of, the anesthetist was responsible for the patient's well being, and the surgeon was responsible for the surgery.

It appears that some 400 of these instruments were imported and sold to the State of New York Civil Defense and are presumed to be in storage for that purpose. The witness stated that the imported article is actually two units combined and is used as an anesthesia device and also as a breathing assistor. It also serves as a resuscitation device.

This is an appropriate case for application of the principle, which has been applied in a number of decisions of our appellate court, that a "sample is ofttimes a very potent witness." *United States* v. *May Department Stores Co.*, 16 Ct. Cust. Appls. 353, T.D. 43090; *United States* v. *Bernard, Judae & Co.*, 18 CCPA 68, T.D. 44029; *United States* v. *The Halle Bros. Co.*, 20 CCPA 219, T.D. 45995; and *United States* v. *University of Chicago Press*, 23 CCPA 38, T.D. 47685.

In *United States* v. *Sears, Roebuck & Co.*, 27 CCPA 235, C.A.D. 91, the court observed—

It is true that a sample of an imported article introduced in evidence is sometimes alone sufficient to overcome the presumption of correctness of the collector's classification, * * *.

Note also *United States* v. *Fuchs Shoe Corporation*, 41 CCPA 179, C.A.D. 547, and *Coro, Inc.* v. *United States*, 41 CCPA 215, C.A.D. 554.

Although a physical exhibit of the apparatus is not before us, nevertheless, the device is faithfully represented by the photographs in exhibits 1 and 2.

As stated by the witness Smith, while the apparatus may be utilized during surgery, "it is not part of the surgical technique; it is part of the anesthetic technique." Operating room lights and operating tables, for instance, are used during the process of surgery, but it is doubtful if one would seriously contend that such articles are surgical instruments.

The appearance of the importation, as reflected in exhibits 1 and 2, implemented by the uncontradicted testimony of Smith, whose long experience in the particular use of anesthetic apparatus, satisfies us that the subject merchandise is not, in fact or in law, a surgical instrument.

As illustrations of articles which may properly be classed as surgical instruments are surgical forceps, surgical clamps, and needle holders which are used in surgery. *United States* v. *Kny-Scheerer Corporation of America*, 14 Ct. Cust. Appls. 446, T.D. 42080.

It remains to be determined whether the apparatus should be classified as a machine in paragraph 372, *supra*, or as an article in chief value of metal in paragraph 397.

In support of its claim for classification as a machine, plaintiff, in its brief, contends that the apparatus meets the definition of a machine, as set forth in *United States* v. *IDL Mfg. & Sales Corp.*, 48 CCPA 17, C.A.D. 756, *Nord Light, Inc.* v. *United States*, 49 CCPA 12, C.A.D. 786. While it may be, as stated in plaintiff's brief, that the merchandise in controversy "is a complicated device consisting of many parts, including containers, dials, indicators, tubing, bellows, valves, etc.," the record is lacking in satisfactory proof of the functioning of the various parts which would bring the complete entity within the meaning of the term "machine" set forth in the above two cases.

In the *IDL Mfg.* case, the court held that a paper punching machine fell within "* * * the median definitions of 'machine' to be found in dictionaries * * *" and gave as an example the definition from Webster's New International Dictionary, which is quoted as follows:

Any device consisting of two or more resistant, relatively constrained parts, which, by a certain predetermined intermotion, may serve to transmit and modify force and motion so as to produce some given effect or to do some desired kind of work; * * *.

Other definitions of similar import were also cited by the court.

In the *Nord Light* case, certain pulleys for light fixtures were held to be properly classifiable as machines, the court relying upon its earlier decision in the *IDL Mfg.* case.

The evidence herein utterly fails to establish that the anesthetic outfit in controversy has the qualities which bring it within the scope of the common meaning of the word "machine" above set forth. We find, therefore, that the record does not sustain the claim for classification of the apparatus as a machine.

Inasmuch as the imported article is not otherwise specially provided for, and it having been agreed by the parties hereto that it is composed in chief value of iron, steel, brass, bronze, zinc, or aluminum, it comes within the basket provisions of paragraph 397 of the Tariff Act of 1930, as modified by the sixth protocol, *supra*, which provides duty at the rate of 21 per centum or 20 per centum ad valorem, depending upon the date of entry. Accordingly, this alternative claim of plaintiff is sustained and judgment will be so entered.