(C.D. 3853)

MONTGOMERY WARD & CO. v. UNITED STATES

United States Customs Court, First Division

(Decided June 24, 1969)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*William D. Ruckelshaus,* Assistant Attorney General (*Robert T. Richardson* and *Andrew P. Vance,* trial attorneys), for the defendant.

Before WATSON, MALETZ, and RE, Judges

MALETZ, Judge: The issue in this case is the proper tariff classification of certain 20-key and 22-key accordions that were imported from Italy and entered at the port of New York. The articles were classified by the government under item 737.60 of the Tariff Schedules of the United States (19 U.S.C. § 1202) as toy musical instruments, dutiable at 26 percent ad valorem. Plaintiff challenges this classification, claim-

ing that the importations are not toy musical instruments but rather are musical instruments which are properly classifiable under item 725.14 as piano accordions at the rate of 14 percent ad valorem. We sustain the government's classification.

Reproduced below are the provisions of the tariff schedules with which we are concerned:

*Classified under:*

> *Schedule 7—Part 5—Subpart E Models;*
> *Dolls, Toys, Tricks, Party Favors*
> *Subpart E headnotes:*
>
> 1. The articles described in the provisions of this subpart (except parts) shall be classified in such provisions, whether or not such articles are more specifically provided for elsewhere in the tariff schedules * * *
> 2. For the purposes of the tariff schedules, a *"toy"* is an article chiefly used for the amusement of children or adults.

> \* \* \* \* \* \* \*

737.60      Toy musical instruments_____    26% ad val.

*Claimed under:*

> *Schedule 7—Part 3—Subpart A Musical*
> *Instruments*
> *Subpart A headnotes:*
>
> 1. This subpart does not cover—
>     (i) articles which are toys (see part 5 of this schedule) * * *
>
> \* \* \* \* \* \* \*
>
> Wind musical instruments:
>
> \* \* \* \* \* \* \*
>
> Accordions and concertinas:

725.14        Piano accordions_____    14% ad val.

The record—which we now summarize—consists of the testimony of two witnesses for plaintiff and one for defendant together with two exhibits—the first being a sample of the *20-key* accordion; the second, the Montgomery Ward 1965 Christmas catalogue. It was established by plaintiff's first witness—an employee in its import department—that a sample of the 22-key accordion could not be obtained; that the two accordions in dispute were offered for sale through the 1965 Christmas catalogue of Montgomery Ward; that they were sold only by catalogue, through department 48 which covers "Christmas tree ornaments, tree lights, Christmas decorations, games, puzzles, the cheaper musical instruments, and some of the toys"; and that the price to the customer was $9.99 for the 20-key accordion and $16.99 for the 22-key

accordion. The accordions were listed in the Montgomery Ward catalogue as a "Student Piano Accordion" under a special section entitled "Complete Index of Toys"—"Wards Special Index of Toys," with the latter index adding that "[o]nly toys are listed here * * *."

Plaintiff's second witness—a rug cutter for Montgomery Ward—has been a professional accordion player "as a side line" for 35 years. He testified that he started with "something * * * [on the] type" of the imported 20-key accordion which gave him "incentive to go ahead building up to larger instruments." Although he had just "slight practice on that particular model," he stated that he was able to play it, and that in his opinion it is capable of playing "on that right-hand side, everything that I possibly play with a professional, practically. Its got a whole range of keys." He also testified that the 20-key accordion has a full-scale piano keyboard for the right hand and with a range of 1½ octaves, and 10 bass buttons which provide harmony and rhythm for the left hand. The witness then demonstrated the model's capabilities by playing the bass buttons with his left hand, and playing the treble keys with his right hand. He expressed the opinion that the accordion could be used to play some tunes, and he then proceeded to play three tunes on it.

On cross-examination the witness testified that he had never actually seen anyone use an article such as the imported 20-key accordion for the study of music. He conceded that his only familiarity with accordions which are used to train students in music schools is based on "what I read in the papers and I notice they have something like this [the importation]." He also stated that he had not seen anybody else save his son play the imported 20-key accordion. Finally, he testified that his own accordion cost $1,500 and has a range of 2½ octaves, as contrasted with the imported 20-key accordion which has a range of only 1½ octaves.

Defendant called as its witness a professional accordionist and music instrument salesman who is currently employed by the Wurlitzer Company in Chicago where he sells musical instruments such as piano accordions and organs. He testified that he has played the accordion for 36 years; that he studied music at a conservatory in Chicago; that he was employed as the musical director for several companies; and that he has taught the accordion, in which connection he indicated that he gave private lessons to some 90 students a week whose age ranged from six years to adulthood.

According to the witness, the accordion which a beginner uses would have a treble keyboard consisting of two octaves, and a bass keyboard consisting of 12 buttons. The beginner's accordion, he added, is built exactly like a professional-type accordion "only cut down for the idea of orienting the youngster [and] making it very easy to move around." He stated that such an accordion is used strictly for beginners, and

that after a student had had from three to six lessons he would automatically be upgraded to an accordion having a three-octave treble keyboard and 120 bass buttons.

The witness then explained that the beginner's accordion differs from the 20-key accordion in issue in the following respects: First, the beginner's accordion has 25 keys and 12 bass buttons as compared with the sample accordion in question which has 20 keys and 10 bass buttons. Second, the beginner's accordion has two octaves as compared with the disputed accordion's 1½ octaves. Third, the beginner's accordion is a little larger than the accordion in question. Fourth, the beginner's accordion has adjustable straps both for the shoulders and wrist; it can be taken apart very easily; and the reeds from the instrument reed box can then be removed or replaced. By contrast, the straps on the imported 20-key accordion are not adjustable; it cannot be taken apart without damaging it and the reed is thus not removable. The witness also expressed the opinion that unlike a beginner's accordion, a normal person would be unable to get his left hand through the left strap on the imported accordion so as to control the expansion and contraction of the bellows.

The witness further testified that in comparison with a beginner's accordion, the imported 20-key accordion has very poor tonal quality. He stated that one cannot learn the accordion by playing on an instrument with less than two octaves; that it is impossible to play a minor chord on the imported accordion; that he has never seen anyone study on an instrument such as the imported accordion; and that, in his opinion, a person could not learn how to play the accordion on an instrument such as the one in question.

Continuing, he testified that plaintiff's previous witness did not play the imported instrument the way the music was written to be played on an accordion. While agreeing that that witness had played a tune as written in an instructional booklet accompanying the imported accordion, he stated that the music contained in that booklet was written only for the right hand and that what the witness had played with his left hand was something that did not appear in that booklet.

On cross-examination the witness played in a commendable manner two tunes contained in the instructional booklet. He declared that all the music contained in the booklet was written in the key of C and that a student could not learn to play chords from the music in that booklet. He said that the imported accordion is only capable of playing simple tunes written in a major key but can not be used to play a song—regardless of how simple—written in a minor key. Thus, if a piece of music were written in the key of A flat, he stated that it would be impossible to play it on "this accordion."

He testified finally that a piano accordion has a piano keyboard on the treble side and that the imported accordion has a piano keyboard but not a complete one.

Turning now to the legal aspects, it is to be noted that the issue of "musical instruments" vis-a-vis "toys" has been before the court in a number of cases under previous tariff acts. For example, in *August Pollmann, et al.*, 4 Treas. Dec. 118, T.D. 22765 (1901), certain violins and accordions were classified by the government as musical instruments and claimed by the importer to be properly classifiable as toys—which bore at that time a lower rate of duty. At the outset the Board of General Appraisers prescribed the following guidelines (*id.* at 119) :

> If an article is capable of being played upon as a musical instrument by a person who has learned to play such an instrument, whether that person be a child or an adult, it can not be said to be chiefly designed and suitable for use as a plaything for children, and is not a toy. If it is so capable of being played upon as a musical instrument, it is immaterial what may be its size, the quality of its tone, its price, or the cheapness of its construction.

Applying these guidelines, the Board sustained the classification of the violins as musical instruments on the basis that while they were of very cheap construction, they were quite capable of being played upon by anyone able to play the violin; were fitted with strings which could be tuned to the proper pitch; and were designed to be used as musical instruments, especially by beginners ambitious to become violinists. The accordions, however, were held to be toys in light of the record which showed that they had less than the regular number of keys; their range was from 4 to 12 tones less than that of an ordinary accordion; and that while they produced sounds by the manipulation of the bellows and the keys, they were not such instruments as could be practically used for musical purposes by anyone, whether a musician or not, or whether skilled in the use of an accordion or not.

Another leading case under a prior tariff act is *United States* v. *Sears, Roebuck & Co.*, 23 CCPA 348, T.D. 48209 (1936). There the merchandise was described in the headnote as so-called musical instruments, such as cheap, flimsy imitations of saxophones, accordions, trumpets, trombones, and flutes with defective keys and notes, and scales imperfectly tuned, not used by musicians in the rendition of music or for teaching, although simple airs could be played upon them by persons skilled in their use. These instruments were held to be toys under paragraph 1513 of the Tariff Act of 1930, and not musical instruments, the preponderance of the evidence showing that their major use was by children for the purpose of amusement. Further, in *Kindel & Graham* v. *United States*, 70 Treas. Dec. 601, T.D. 48620 (1936), it was held that miniature grand pianos, having

an octave of eight white keys on which simple tunes could be played, used chiefly for the amusement of children, were dutiable as toys under paragraph 1513 of the Tariff Act of 1930.

It is in this setting that the United States Tariff Commission's *Tariff Classification Study* (Nov. 15, 1960), dealing with schedule 7 of the proposed new tariff schedules, had the following to say (p. 227):

> As indicated in headnote 1(i), toy musical instruments are not covered in this part. The duties on musical instruments in paragraph 1541 are materially lower than the duty on toy musical instruments under paragraph 1513. Because of this rate difference, and the tendency of the customs courts to give broad application to the provisions for musical instruments in paragraph 1541, claims are constantly being made that imported toy musical instruments are true musical instruments, rather than toys, in order to obtain the lower rate of duty. This problem has been one of the most bothersome and difficult encountered by customs officers in connection with the tariff provisions for musical instruments. The problem is not easily solved by a definition in view of the wide variety of musical instruments and the differences from instrument to instrument. However, it is believed that, in general, *an instrument is a toy rather than a true musical instrument when it is of a type of such character and quality that it would not ordinarily be used for serious musical study or use, but rather would be used primarily for amusement.* [Emphasis added.]

This distinction is reiterated at page 291 of the same volume:

> As stated above, the conflict between the existing provisions for toys and those for games, sports equipment and musical instruments have been particularly troublesome. Although these conflicts cannot be completely resolved by precise product definitions, the general distinctions have been explained in the notes relating to musical instruments and sports equipment. It was stated in such notes that, in general, in those instances where there may remain a possible conflict between the provisions for musical instruments and those for toys (for example, the provision for pianos), it is intended that *only those instruments of such quality and character as would ordinarily be used for serious musical study or use are to be classified under the provisions for musical instruments.* [Emphasis added.]

From what has been said, it is clear that the intent under the tariff schedules is that an article should be classified as a true musical instrument rather than a toy musical instrument only if it is of such quality and character as would ordinarily be used for serious musical study or use. Thus the crucial question here is whether plaintiff has proven by a preponderance of the evidence that the 20-key and 22-key accordions in dispute are of that type. Based on the present record, we conclude that the answer is in the negative.

To start, we observe that plaintiff's witness showed that the imported 20-key accordion is capable of producing a recognizable melody. But to this must be added the unrefuted testimony of defendant's witness

that plaintiff's witness had not performed the songs as they were meant to be played on an accordion; that the imported article is incapable of playing certain cords necessary for a proper accordion-type rendition of the tunes; and that the article is incapable of playing a tune in a minor key. Moreover, the fact that the witness was able to play tunes on the instrument "does not at all prove its use in playing music as * * * [accordion] players would play it." *United States* v. *Illfelder & Co.*, 18 CCPA 31, 32–33, T.D. 44002 (1930).

We note, too, the testimony of plaintiff's witness that he "started with something * * * [on the] type" of the imported article which gave him "incentive to go ahead building up to larger instruments." This would indicate that in his opinion the article is of value primarily to beginners in the study of music. Yet this witness had never seen anyone use an instrument like the imported one for the study of music, nor had he even seen anyone (save himself and his son) play such an instrument. Significant also on this phase is the testimony of defendant's witness that he had never seen anyone study the accordion on an instrument such as the one in question; that even a beginner's accordion—which is functional only for about three to six lessons—possesses features—in terms of octave range, number of bass notes, and adjustable straps—that are considerably more advanced than those on the imported article; that one cannot learn the accordion by playing on an instrument which has a range of less than two octaves; that the imported accordion has a range of 1½ octaves; and that in his opinion a person could not learn how to play the accordion on an instrument such as the one in question.

Further, it is apparent that plaintiff's witness was not unmindful of the fact that the imported article had definite amusement value for children. For he testified "I have got a little ten-year-old boy. He was so goofy about it I took his picture. Here it is strapped on my ten-year-old boy. No lessons or anything; he just picked it up by ear. I says [sic], 'I will give you one of these if you want and you can read the instructions and follow it.' " Such a use would scarcely seem to be the "serious musical study" that Congress contemplated.

It is also worthy of mention that the imported articles were (as we have seen) listed in the Montgomery Ward catalogue under a special section entitled "Complete Index of Toys"—"Wards Special Index of Toys," with the latter index adding that "[o]nly toys are listed here * * *." The fact that the articles were thus marketed as toys— while not determinative— has obvious probative value. See e.g., *Davis Products, Inc.* v. *United States*, 59 Cust. Ct. 226, 230, C.D. 3127, 279 F. Supp. 448, 451 (1967) ; *New York Merchandise Co., Inc.* v. *United States*, 62 Cust. Ct. 38, 44, C.D. 3671, 294 F. Supp. 971, 976 (1969). Cf. *International Customs Service, Inc.* v. *United States*, 62 Cust. Ct. 653, C.D. 3843 (1969).

In sum we hold that plaintiff has failed to prove by a preponderance of the evidence that the imported articles are of such quality and character as would ordinarily be used for serious musical study or use. The presumption of correctness attached to the government's classification of the articles as toy musical instruments has therefore not been overcome. The protest is overruled and judgment will issue accordingly.