(C.D. 4115)

AMERICAN RUSCH CORP.. *v.* UNITED STATES

United States Customs Court, First Division

(Decided November 2, 1970)

*Lane, Young & Fox* (*James G. McGoldrick* and *Allerton deC. Tompkins* of counsel) for the plaintiff.

*William D. Ruckelshaus*, Assistant Attorney General (*Herbert T. Posner* and *Harold L. Grossman*, trial attorneys), for the defendant.

Before WATSON, MALETZ, and RE, Judges

MALETZ, Judge: The problem in this case is to determine the proper rate of duty on certain medical instruments known as Magill and Rovenstin forceps (67/16171) and Wisconsin and Macintosh laryngoscope blades (68/59645). The forceps—which were imported from Pakistan via the port of New York in April 1966—were classified by the government under item 709.27 of the tariff schedules as other medical or surgical instruments and assessed duty at the rate of 36 percent ad valorem. The laryngoscope blades—which were imported from West Germany via the port of New York in January and June 1968—were classified by the government under item 709.15 as other electro-surgical apparatus and parts thereof and assessed duty of 32 percent.

Plaintiff-importer contends that these assessments are erroneous, claiming that the imported forceps and laryngoscope blades are properly classifiable under item 709.06 as anesthetic instruments and that the forceps are thus dutiable at the rate of 19 percent and the laryngoscope blades at the rate of 17 percent (which lower rate was in effect at the time they were entered).

The statutory provisions with which we are concerned are contained in schedule 7, part 2, subpart B of the tariff schedules and read as follows:

Medical, dental, surgical and veterinary instruments and apparatus (including electro-medical apparatus and ophthalmic instruments), and parts thereof:

\* \* \* \* \* \* \*

Other:

| | |
|---|---|
| 709.06 Anesthetic apparatus and instruments (except syringes), and parts thereof_____ | 19% ad val. |
| | 17% ad val. |

\* \* \* \* \* \* \*

Electro-medical apparatus, and parts thereof:

| | |
|---|---|
| 709.15 Electro-surgical apparatus, and parts thereof_____ | 32% ad val. |

\* \* \* \* \* \* \*

Other:

\* \* \* \* \* \* \*

| | |
|---|---|
| 709.27 Other _____ | 36% ad val. |

The imported forceps and laryngoscopes are used (among other things) in connection with intubating a patient for general anesthesia in preparation for surgery.[1] Intubation, it is to be noted, is the introduction of one end of a rubber or plastic tube, known as an endotracheal tube, into the larynx through the mouth. It is one of several steps in the administration of general anesthesia for surgical purposes. The first step consists of a physical examination of the patient by the anesthesiologist to ascertain whether there are any impediments to intubating him. A barbiturate such as sodium pentathol is then intravenously introduced into the patient, producing a state of unconsciousness. The effectiveness of the barbiturate, however, is usually limited to 10 minutes so that further measures must be taken to induce deep or prolonged anesthesia. To this end, following the administration of the barbiturate, the anesthesiologist injects a muscle relaxant such as succinyl choline which causes the muscles of the body to completely relax and to stop functioning, thus preventing the automatic muscular reflexes from interfering with the delicate surgical procedures. At the same time, the injection of the muscle relaxant causes the patient's respiration to cease—which makes it essential for the anesthesiologist to provide another form of respiration within a matter of minutes. At this juncture, intubation is accomplished in the following manner:

First, the anesthesiologist inserts a laryngoscope blade—similar to the ones in issue—into the patient's mouth and then lifts the blade upward in a direction parallel to the handle of the blade. Upon application of this force, the laryngoscope blade—which is specially designed for this purpose—depresses the patient's tongue and exposes the larynx. (Illumination is provided by a battery-operated bulb on the blade.) After the larynx is so exposed, the anesthesiologist takes up a forceps in his other hand and uses it to grasp the endoctracheal tube and insert it into the larynx.[2] Once this tube is inserted, the anesthesiologist removes the laryngoscope blade from the patient's mouth. He then connects the tube to the anesthesia gas machine and artificial respirator—an apparatus which passes a mixture of oxygen and anestheia gas into the respiratory system through the endotracheal tube. The oxygen maintains the patient's life, while the anesthesia gas maintains unconsciousness, thus protecting the patient against the pain of the surgery.

Finally, it is to be observed that in addition to being used in connection with the administration of general anesthesia, intubation is

---

[1] Anesthesiology, a well qualified witness testified, is "a specialty of medical practice which is concerned with the producing of unconsciousness and looking after the patient during [an] operation."

[2] In order to prevent damage to the endotracheal tube, the forceps are specially designed so as not to close completely. Also, the forceps' shaft and handles are designed so as not to impair the anesthesiologist's view into the mouth.

also used (1) to aid breathing when the airway (windpipe) has been obstructed; and (2) as part of resuscitation to restore breathing. In both these latter procedures, the purpose of intubation is to pump oxygen into the patient from an artificial respiration apparatus.

Against this background, the parties agree that the imported forceps and laryngoscope blades "are used chiefly and designed for intubation." The issue therefore is whether or not intubation is chiefly used in connection with the administration of anesthesia as opposed to its use for the purpose of supplying oxygen to the patient in connection with artificial respiration.

Persuasive on this issue is the uncontradicted and unrebutted testimony of plaintiff's witness—an extremely well qualified anesthesiologist (as defendant has conceded). This witness—the chairman of the department and professor of anesthesiology at Mount Sinai Hospital, New York City—has worked as an anesthesiologist in England and Germany, as well as in the United States. He testified that he had observed the use of forceps and laryngoscope blades such as those in question at a number of hospitals in New York City; Cleveland, Ohio; and Pittsburgh, Pennsylvania; and that he was associated with hospitals in each of those cities for extended periods of time. He has also observed the use of such instruments at hospitals in other important medical centers, including Baltimore, Maryland; New Orleans, Louisiana; Chicago, Illinois; Rochester, Minnesota; and San Francisco, California. Further, he has taught at medical schools in New York City; Pittsburgh, Pennsylvania; and Cleveland, Ohio. In addition, he testified that the intubation procedure for resuscitation and artificial respiration is included in the anesthesiology course as taught at medical schools in general and as given by him in particular. He indicated also that in all major hospitals, the common practice is to call on the anesthesiologist to help intubate the patient and to participate in the resuscitation procedure itself.[3]

Throughout his testimony, the witness emphasized consistently that the normal, main and chief use in the United States of instruments such as the imported forceps and laryngoscope blade is to intubate patients in connection with the administration of anesthesia, as distinguished from their usage for intubation in connection with artificial respiration for resuscitation or to ease breathing problems. He added that such latter uses of the intubation procedure to supply oxygen "if a patient ceases to breathe or * * * [his] airway becomes obstructed" are occasional and "not common" uses.

Considering the witness' qualifications, his professional experience throughout a geographical cross-section of the nation, and his impres-

---

[3] A further witness—an otolaryngologist called by plaintiff—testified similarly that except in case of emergency, intubations were generally performed by anesthesiologists.

sive credibility, we conclude that the imported instruments are chiefly used in intubation in connection with the administration of general anesthesia. See e.g., *L. Tobert Co., Inc., et al.* v. *United States*, 41 CCPA 161, 164, C.A.D. 544 (1953). See also e.g., *Empire Findings Co., Inc.* v. *United States*, 44 Cust. Ct. 21, 30, C.D. 2148 (1960). And supporting this conclusion is the fact that the catalogues of three major medical instrument companies refer to the instruments in question as "anesthetic" equipment. For the manner in which merchants market their goods—while not determinative—has obvious probative value on what they are or how they are used. E.g., *Montgomery Ward & Co.* v. *United States*, 62 Cust. Ct. 718, 724, C.D. 3853 (1969), and cases cited.

Withal, defendant argues (1) that the imported instruments were intended by Congress to be classified as surgical rather than anesthetic instruments, and (2) that they are not anesthetic instruments since they do not directly administer anesthesia. In support of its first contention, defendant relies on *J. J. Boll, et al.* v. *United States*, 34 Cust. Ct. 218, C.D. 1707 (1955). That case concerned the proper classification under the Tariff Act of 1930 of small incandescent electric light bulbs that were used in connection with laryngoscope blades—which blades were similar to those involved here and, as in the present case, were used largely in connection with the administration of general anesthesia. The bulbs were classified by the government as parts of surgical instruments under paragraph 359 and were claimed to be properly classifiable under paragraph 229 as incandescent light bulbs. The court sustained the government's classification, holding (1) that the administration of anesthetics was a surgical maneuver or operation, and (2) that since the laryngoscope blades were chiefly used in the administration of anesthesia, they were therefore surgical instruments within the meaning of paragraph 359. *Cf. The O.E.M. Corp.* v. *United States*, 50 Cust Ct. 138, C.D. 2402 (1963). Considering that the light bulbs were integral parts of the laryngoscope blades, the court held that they were classifiable as parts of surgical instruments rather than as incandescent light bulbs since the former was a use provision and therefore prevailed over the latter *eo nomine* provision.

*Boll*, however, is not determinative of the present issue. For one thing, under the 1930 act there was no provision covering anesthetic apparatus and thus the court had no occasion to consider the question now before us. Second, Congress in enacting the Technical Amendments Act of 1965 mandated a specific distinction between surgical instruments and anesthetic instruments. The circumstances were as follows: As originally enacted in 1963, the tariff schedules contained no provision for anesthetic instruments or apparatus. Item 709.06—

the provision involved here which covers anesthetic instruments—was added to the tariff schedules by section 60 of the Technical Amendments Act of 1965, 79 Stat. 933. The reason for the inclusion of this separate and distinct provision for anesthetic instruments was explained by the House Ways and Means Committee as follows (H. Rept. 1728, 88th Cong., 2d Sess. (1964) p. 33):

### SECTION 45. ANESTHETIC APPARATUS * * *

#### 1. *Treatment under the old schedules*

Anesthetic apparatus * * * had been classified under paragraph 359 of the old tariff schedules as surgical instruments at the rate of duty of 36 percent ad valorem. Recent court rulings (* * * C.D. 2402) held that these articles were not classifiable under paragraph 359 [as surgical instruments] but were classifiable under the provisions of paragraph 397 at 19 percent ad valorem [as metal articles nspf].

#### 2. *Treatment under the tariff schedules of the United States*

* * * [M]ost articles that are considered to be anesthetic apparatus are provided for under the new schedules under item 709.27 [other medical and surgical instruments and apparatus] at 36 percent ad valorem. This rate is based on the provisions of former paragraph 359.

#### 3. *Proposed changes*

Section 45(a) of the bill would establish new item 709.06 for anesthetic apparatus with a rate of 19 percent ad valorem * * *. The amendments would reflect the substance of the court rulings cited above.

C.D. 2402—the case referred to by the Ways and Means Committee—which occasioned the change in the tariff schedules is *The O.E.M. Corp.* v. *United States, supra,* 50 Cust. Ct. 138. There, parts of an "EMO Anaesthetic Outfit" consisting of an " 'E.M.O.' Inhaler" and an "Oxford Inflating Bellows" were classified by the government as surgical instruments under paragraph 359 of the Tariff Act of 1930. The imported equipment, as indicated by the testimony, was used as anesthetic apparatus and breathing assistors. The court found that the imported articles as used were not part of the surgical technique but rather were part of the anesthetic technique (*cf. J. J. Boll, et al.* v. *United States, supra,* 34 Cust. Ct. 218) and, distinguishing between the two, held the importations were properly classifiable not as surgical instruments but as metal articles nspf under the basket provisions of paragraph 397. And it was to maintain this distinction between surgical and anesthetic instruments that item 709.06 was, as we have seen, added to the tariff schedules in 1965.

This leaves for consideration defendant's last contention that the imported articles are not anesthetic equipment because they do not directly administer the anesthesia. We do not agree. For we think

it clear that where instruments such as those in issue are necessary equipment for the anesthesiologist in the practice of his profession and are part of the anesthetic technique, they fall within the purview of item 709.06 as anesthetic instruments. See *Jensen Salsbery Lab., Inc.* v. *United States*, 66 Treas. Dec. 363, 365, T.D. 47313 (1934) ; *J. J. Boll, et al.* v. *United States, supra*, 34 Cust. Ct. at 225; *The O.E.M. Corp.* v. *United States, supra*, 50 Cust. Ct. 138. *Cf. Tariff Classification Study (1960), Schedule 7*, p. 146.

The protests are sustained. Judgment will be entered accordingly.